UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN DOE,<br><br>                              Plaintiff,<br><br>v.<br><br>REGENTS OF THE UNIVERSITY OF CALIFORNIA and DOES 1 through 10, inclusive,<br><br>                              Defendants. | Case No.: 22-CV-1506 JLS (VET)<br><br>**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>(ECF No. 52) |

Presently before the Court are Defendant Regents of the University of California's ("Defendant" or "University") Motion for Summary Judgment ("MSJ," ECF No. 52) and Memorandum of Points and Authorities in Support Thereof ("Mem.," ECF No. 52-1), Plaintiff John Doe's ("Plaintiff" or "Doe") Opposition to Defendant's Motion for Summary Judgment ("Opp'n," ECF No. 56), and Defendant's Reply in Support of its Motion for Summary Judgment ("Reply," ECF No. 57).

The Court heard oral argument on December 5, 2024. *See* ECF No. 63. Having carefully considered the Parties' arguments, the law, and the evidence, the Court **DENIES** Defendant's Motion for Summary Judgment as follows.

# BACKGROUND

## I.    Factual Background[1]

John Doe was a medical student at the University of California, San Diego School of Medicine when the car he was riding in was tragically struck by a drunk driver on May 16, 2015.  Declaration of Carolyn Kelly ("Kelly Decl.," ECF No. 52-11) ¶ 7.  On that day, two of Doe's medical school classmates lost their lives, and Doe was left faced with an uphill battle to maintain his mental health and reestablish his footing within the rigorous medical school curriculum.  *Id.*

This case arises out of that struggle.  In short, after over eight years as a medical student, Doe was denied an accommodation to extend the amount of time he had to complete his graduation requirements, resulting in the University blocking his enrollment.  *See* ECF No. 52-5 at 49–50.  Doe now believes the University wrongfully denied his accommodation, and he seeks relief from this Court in the form of damages and injunctive relief requiring the University to reinstate him as a medical student.  *See* ECF No. 1 ("Compl.") at 23–24.

### A.    *Doe's Enrollment at the University*

Doe enrolled at the University in September 2012 after having received a Bachelor of Science degree in Mechanical Engineering from Purdue University in 2006, a Master of Science degree in Biomedical Engineering from Johns Hopkins University in 2008, and a Master of Business Administration degree from Yale university in 2010.  ECF No. 52-6 at 10.  By all accounts, Doe performed quite well in his pre-medical school studies, earning a 4.0 undergraduate GPA from Purdue and a 3.9 master's GPA from Johns Hopkins University.  *Id.*  Although Doe reports that he did not struggle through those studies, he remained invested in a paper that he had been working on while at Johns Hopkins.  Deposition of John Doe ("Doe Dep.," ECF No. 52-4) at 16:11–18:16.  Doe continued working on this paper during his time at the University.  *Id.*

---

[1] The following facts are undisputed unless otherwise noted.

### B.    University Policies and Procedures

The University's self-declared goal "is to develop compassionate, scientifically informed, and conscientious physicians prepared for the changing conditions of medical practice and continuing self-education." ECF No. 52-4 at 90.  To assist in carrying out that goal, the University publishes an Advisor and Student Handbook ("Handbook") in which it "provide[s] students with essential information regarding the School of Medicine curriculum and policies." *Id.* at 5.

As far as the curriculum is concerned, students begin with the pre-clerkship core curriculum, which consists of a mostly preselected offering of courses ranging from Foundations of Medicine to Musculoskeletal System to Microbiology.  *Id.* at 13–14. Following completion of the pre-clerkship curriculum in their first two years, students proceed into their clinical clerkships, which provide a hands-on opportunity to put the skills they learned in the classroom to practical use in the hospital. *Id.* at 16–17.  The University nominally expects its students to complete the requirements of the M.D. degree within four years, but it sets the maximum allowed time to complete the M.D. requirements at six years as measured by "the end of spring quarter in the sixth year after matriculation."[2]  *Id.* at 24.

The general requirements for graduation are enumerated in the Handbook, and they include the satisfactory completion of a series of exams administered by the National Board of Medical Examiners ("NBME"), a third-party licensing body.  Declaration of Jess Mandel ("Mandel Decl.," ECF No. 52-13) ¶ 4.  These exams are part of the United States Medical Licensing Examination ("USMLE"), and they include Step I, Step II CS, and Step II CK.[3]  *Id.*  Each Step Exam is integrated into the academic curriculum at the University in a particular way.  As prescribed by the Handbook, students are expected to take and pass

---

[2] The six-year limit has certain exceptions for students in an MD-PhD program or the Medical Scientist Training Program; neither exception applies to Doe.  *See* ECF No. 52-4 at 24.

[3] The Step II CS exam has been discontinued following the COVID-19 pandemic.  *See Work to Relaunch USMLE Step 2 CS Discontinued*, U.S. Med. Licensing Examination (Jan. 26, 2021), https://www.usmle.org/work-relaunch-usmle-step-2-cs-discontinued.

the Step I Exam at the end of the pre-clerkship curriculum, i.e., at the end of their second year, and they are not permitted to advance to the third-year clinical curriculum without having done so. ECF No. 52-4 at 12. Further, "Step II CK must be taken within 3 months after completion of the third year of the curriculum."[4] *Id.* Each student is allowed three attempts at each of the Step Exams and "shall be denied further registration in the School of Medicine upon failure to pass Step I [or II] of the [USMLE] after three successive attempts." *Id.* at 71–72. Importantly, the University has no control over USMLE testing or USMLE accommodations, but students must be officially enrolled in, or be a graduate of, a medical school program to be eligible to sit for the Step Exams. *See* ECF No. 56-5 at 32.

Between the pre-clerkship curriculum, clinical studies, Step Exams, and more, medical students at the University are challenged in a multitude of ways and have plenty of obligations to juggle. Meanwhile, their academic progress is continuously monitored by the University's Standing and Promotions Committee ("SPC"). The Handbook describes the SPC as "charged with examining the records of all students at the end of each quarter and making decisions regarding future course work for students who experience academic difficulties." *Id.* at 65. In addressing student standing, the SPC has multiple tools at its disposal, including referring routine matters to the Associate Dean for Undergraduate Medical Education, requiring a student to appear before the SPC to discuss a concern, placing a student on academic probation, and holding a Review Hearing. *Id.* at 66–70.

While the SPC, at times, has discretion in how to treat any particular circumstance, other times it is restricted to predetermined actions. For example, any student who "receives a fail grade on the USMLE Step I or Step II (either the Clinical Knowledge or the Clinical Skills section)" "***will*** be placed on academic probation." *Id.* at 67 (emphasis

---

[4] Although the University places constraints on when medical students must take the Step Exams, it represented at oral argument that the Exams are offered nearly every day of the year, offering maximum flexibility to students.

in original).  Compare that mandatory action with the permissive one in which the SPC has the discretion to maintain a student on probationary status even after passing the Step Exams if the student has had significant academic difficulty.  *Id.*  This probationary status can carry repercussions as students on academic probation "must be described as 'not in good standing' for certain purposes, such as" recommendation letters and scholarship programs.  *Id.*

Aside from engaging the SPC to oversee academic progress, the University also employs a Technical Standards Advisory Committee ("TSAC") in tandem with the Office of Student Disabilities ("OSD") to address accommodation requests from students with purported physical or mental conditions.  *See id.* at 40–41.  Each student is responsible for initiating a formal request for accommodations with the OSD such that any "student who elects not to register with the OSD will not be considered to be claiming or receiving accommodations . . . ."  *Id.* at 41.  In the event of a certified disability, "the OSD will provide recommendations for accommodations to the Associate Dean for Undergraduate Medical Education, who will promptly consult with affected faculty."  *Id.*  If the proposed accommodations are reasonable to all interested parties, then they will be implemented. *Id.*  If not, then the proposed accommodations are referred to the TSAC, which will consult with the affected faculty to determine if "the proposed accommodations can be reasonably implemented without causing the School of Medicine undue hardship and without fundamentally altering the School of Medicines academic standards."  *Id.*  If the proposed accommodations are eventually denied, then the Associate Dean for Undergraduate Medical Education and the Associate Dean for Admissions and Student Affairs are "to work with the student and the OSD to determine whether other accommodations can be identified that would not have such effect but that would facilitate the student's medical education."  *Id.*  The accommodations procedures also include a complaint and appeals process.  *Id.* at 42.

/ / /

/ / /

### C.    Doe's Pre-Accident Studies and the Accident

After entering the University, Doe completed his first few semesters of the pre-clerkship curriculum with limited involvement from his faculty supervisors, having completed all his courses satisfactorily and finding himself in good academic standing. ECF No. 56-5 at 116, 122–23.  Nevertheless, on March 31, 2014, Doe requested a meeting with Dean Carolyn Kelly, Associate Dean for Admission and Student Affairs at the University, to propose a year-long leave of absence so that Doe could address the "excessive stress and anxiety he was feeling about medical school, academic commitments from previous educational programs[, including the Johns Hopkins paper], and his personal life."  Kelly Decl. ¶ 3.  After meeting with Doe and receiving a letter from his psychiatrist supporting the request, Dean Kelly consulted with Associate Dean Jess Mandel, and the University granted Doe a leave of absence from June 14, 2014, through the Summer 2015 quarter.  *Id.*

Throughout this first leave of absence, Doe met with Dean Kelly multiple times to discuss the status of his mental health and to develop a plan for his return to his medical school studies.  *Id.* ¶ 4.  The two also discussed a proposal by Doe to extend his deadline for taking the Step I Exam, which, in the ordinary course, he would have taken by May 2014.  *Id.*  Dean Kelly attempted to maintain Doe's studies as close to the nominal schedule as she could because, in her view, "it is not advantageous to students to continue to delay taking the Step exams, because they can forget information relevant to the Step exam."  *Id.*  Despite that caution, Deans Kelly and Mandel agreed to multiple extensions of Doe's deadline, first to November 3, 2014, then to January 31, 2015, then to May 2015, and finally to July 2015.  *Id.*  According to Dean Kelly, the requests were based on "ongoing difficulty completing his academic work for Johns Hopkins University, or because of continued struggles with his mental health, or a combination of both."  *Id.*

During these discussions is when tragedy struck.  On May 16, 2015, Doe and four other University medical students were struck by a drunk driver, killing two at the scene of the accident and hospitalizing three others, including Doe.  Doe Dep. at 77:21–78:21.

Doe immediately requested another extension to his Step I Exam deadline from July 9 to August 16, 2015, which Deans Kelly and Mandel granted.  Kelly Decl. ¶ 8.  Doe did not request any additional extensions at that point to the August 16 deadline nor did he seek accommodations from NBME, citing pressure "to put on a brave face for [himself] and do everything Dean Kelly asked, no matter the consequences."  Doe Dep. at 83:22–84:8.  In a meeting that August with Dean Kelly, Doe said that he was not ready to take the Step I Exam, but he claims that Dean Kelly said that he had to meet his deadline anyway.  *Id.*  So Doe took the Step I Exam on August 13, 2015 for the first time, just three months after the fatal accident, without accommodations, and failed.  *Id.* at 91:12–19.  The next month, the SPC placed Doe on academic probation, noting that he "has taken a significant amount of leave time and this may affect his ability to complete all requirements by [the 6-year] deadline."  ECF No. 52-5 at 5.

### D.    *Doe's Medical Diagnosis and Post-Accident Studies*

In December 2015, the University referred Doe to neuropsychologist Dr. Sarah Bohn.  *Id.* at 91:21–24.  Doe underwent testing on December 8 and December 10, 2015, from which Dr. Bohn completed a comprehensive assessment, diagnosing Doe with specific learning disability with impairment in reading fluency and rate, post-traumatic stress disorder, post-concussive syndrome, and specific memory difficulty with free auditory recall only.  ECF No. 56-5 at 159.  In her assessment, Dr. Bohn also recommended a set of accommodations, including, among other things, time and a half on exams, testing in a quiet room, and reading text out loud to himself.  *Id.*  It is undisputed that the OSD provided authorization for every testing accommodation Doe requested through the University.  *See* Plaintiff's Separate Statement of Disputed Facts and Supporting Evidence at 11, ECF No. 56-3.

After his sessions with Dr. Bohn, Doe met with Deans Kelly and Mandel to discuss his diagnosis.  Doe Dep. at 106:13–18.  Dean Mandel informed Doe that, because the NBME accommodations request process was lengthy, Doe would likely not receive an answer in time to meet his testing deadline with the University if he were to apply for

accommodations.  Mandel Decl. ¶ 8.  Doe interpreted this as discouragement to apply, so he chose to refrain from applying for accommodations for the second time as he prepared for his next attempt at the Step I Exam.  Doe Dep. at 105:10–106:23.  Meanwhile, Doe requested a second leave of absence from Winter 2015 through Spring 2016, which was approved by Dean Mandel, so he could recover from the car accident and study for his second attempt at taking the Step I Exam.  Mandel Decl. ¶ 7.  Doe then took and failed the Step I Exam for the second time, again without accommodations, on May 12, 2016.  Doe Dep. at 115:17–116:7.

At this point, Doe had not passed the Step I Exam almost four years into his medical school education, pushing him up against the University's six-year limit for completing the M.D. requirements.  ECF No. 52-5 at 7.  Recognizing that he would need more time to meet his graduation requirements, Doe petitioned the SPC to extend the limit from six years to seven years.  *Id.*  On August 31, 2016, the SPC granted the petition after consideration of his scores on the Step I Exam, a summary of the results of his neuropsychological assessment, and the "tragic car accident" that he was involved in.  *Id.*  Doe was now permitted to complete his graduation requirements by June 2019, seven years after commencing his medical school studies.  *Id.*

Doe took a third leave of absence, lasting from September 2016 though Summer 2017, so he could prepare for his third attempt at the Step I Exam, which was to be the final attempt permitted by University policies.  ECF No. 56-5 at 117.  During that time, the SPC held an informational meeting with Doe on November 7, 2016, to discuss his preparation for the Step I Exam, his academic strategies, and his personal support system.  ECF No. 52-5 at 9–11.  On August 12, 2017, Doe passed his third attempt of the Step I Exam, which he did without having applied for accommodations from NBME.  *Id.* at 12; Doe Dep. at 116:9–14.  On September 13, 2017, the SPC reconsidered whether Doe should remain on probation but decided to maintain his probationary status until "he has made further progress in the clinical curriculum."  ECF No. 52-5 at 13.

/ / /

        Around the same time, Doe began his clinical education, enrolling in Medicine 401 during Summer 2017, Surgery 401 during Fall 2017, and Reproductive Medicine 401 and Psychiatry 401 during Winter 2017. ECF No. 56-5 at 117. Doe did not take the shelf exam for Surgery 401,[5] resulting in an incomplete grade, and he did not pass the shelf exam for Reproductive Medicine 401 on his first attempt. ECF No. 52-5 at 15. That failing grade left Doe subject to dismissal for experiencing continued academic difficulty while already on academic probation. *Id.* at 14. Thus, the SPC convened a meeting and decided to hold a Review Hearing, which is where "[s]tudents subject to dismissal from the School of Medicine may be asked to appear before the Standing and Promotions Committee . . . ." *Id.* at 15.

        Prior to the Review Hearing, Doe prepared a statement in which he discussed his struggle with standardized testing and proposed a path forward by which he would be able to complete the M.D. requirements by the revised seven-year University deadline. ECF No. 52-6 at 9–12. In the statement, Doe also requested an extension of an additional quarter to graduate. *Id.* at 12. The SPC held the Review Hearing on May 15, 2018, and decided against dismissing Doe but in favor of maintaining the seven-year deadline. In reaching these conclusions, the SPC provided ten pages of material detailing its facts, findings, decisions, and dispositions. ECF No. 52-5 at 17–26.

        By that point, Doe had begun a fourth leave of absence from March 27, 2018, through Summer 2018, ECF No. 56-5 at 117, from which he returned to school and failed the Clinical Practice Exam ("CPX") on his first attempt in September 2018, ECF No. 52-5 at 28. On November 8, 2018, the SPC decided against holding a second Review Hearing but acknowledged that Doe was "approaching the seven-year time limit for the completion of the MD" despite having arranged to take the CPX for a second time. *Id.* The next day, Doe passed the CPX exam on his second attempt, but the SPC convened the next month

---

[5] As described by Doe, a shelf exam is "similar to the Step II CK exam, but it would be focused on the portion for that clerkship." Doe Dep. at 141:9–13.

and decided to maintain his probationary status, citing his "history of significant academic difficulty." *Id.* at 30.

### E.    The Disputed Accommodation

Doe then failed the Step II CK Exam on his first attempt on March 29, 2019. *Id.* at 32. He did not apply for accommodations to the NBME for the Step II CK exam. Doe Dep. at 135:14–136:1. This failure prompted another SPC review on April 23, 2019, in which the Committee declined to hold a Review Hearing but agreed to a second one-year extension to Doe's graduation requirements. ECF No. 52-5 at 41–42. In agreeing to the extension—which now gave Doe eight years to satisfy the University's graduation requirements—the SPC considered Doe's academic history to date, Doe's plans for applying to the NBME for accommodations on the Step II CK Exam, and Doe's meetings with his neuropsychologist, Dr. Bohn. *Id.* at 31–42. The SPC also noted that "[t]his is a firm deadline, and all requirements must be completed by [Spring Quarter 2020], regardless of the number of attempts (up to 3 attempts) to take Step 2 CK. Recommend that [Doe] make the next attempt of Step 2 CK by the end of December 2019." *Id.* at 41–42. With this one-year extension, the SPC recognized that this timeline would allow Doe to get "the neurospych [sic] testing redone, apply for extra time [to NBME], . . . and then be able to have enough time to potentially take [the Step II CK Exam] twice if needed." *Id.* at 40. Passing the Step II CK Exam was Doe's only remaining graduation requirement at this point. *Id.*

Doe applied for accommodations to NBME on December 17, 2019, Doe Dep. at 159:5–10, and his request was denied on March 26, 2020, ECF No. 56-5 at 227. Although the SPC recommended "that he initiate his planned actions to apply for accommodations immediately" after the April 23, 2019 meeting, Doe says he waited until December 2019 because he did not believe he had "enough time to apply for accommodations, take a test, receive an outcome twice in a one-year time frame." Doe Dep. at 159:11–17. Nevertheless, the SPC granted Doe a third extension to his graduation deadline on April 29, 2020, due to the outbreak of the COVID-19 pandemic, which pushed

Doe's deadline to September 1, 2020. ECF No. 52-5 at 46. In the SPC's discussion of that final extension, "[s]ome committee members expressed concern that [Doe] did not request accommodations earlier, as had been specifically recommended by the Committee in April of 2019." *Id.* at 45. The SPC noted that if Doe did "not complete all requirements by September 1, 2020, then he shall be automatically denied further registration, and shall be dismissed from the School of Medicine." *Id.* at 46.

On July 15, 2020, Doe took the Step II CK Exam for the second time, again without accommodations, and failed. Doe Dep. at 156:22–157:4. Doe petitioned the SPC for an additional eight-week extension to take the Step II CK exam for a third and final time, but on August 26, 2020, the SPC denied the petition. ECF No. 52-5 at 47–50. In denying the petition, the SPC noted the following:

> The Committee . . . has already granted [Doe] extensive accommodation and has extended his time limit already, from six years, to eight years, to an extension of eight years and a few months (to the current deadline of September 1, 2020). The Committee noted that [Doe] has demonstrated a pattern of requesting deadline extensions. A concern was expressed about [Doe's] ability to succeed clinically in residency program and in the practice of medicine, based on his pattern of requesting multiple deadline extensions and not completing requirements as scheduled.
>
> It was noted that [Doe] had been encouraged to request accommodations soon after the SPC meeting on April 23, 2019, but it appears that he did not do this in a timely manner.

*Id.* at 49. In conclusion, the SPC "expressed they were sympathetic to [Doe's] situation related to the fatal car crash," but were concerned about his ability to take and pass the Step II CK Exam after a decline in his scores from his first attempt to his second attempt. *Id.*

///

So the Committee upheld the September 1, 2020 deadline, denied further registration in the School of Medicine, and dismissed Doe. *Id.* at 50.

After Doe's dismissal on September 1, 2020, Doe prepared several letters on his behalf recommending additional time for him to attempt the Step II CK Exam for a third time. *See* ECF No. 56-6 at 55 (letter from Doe's psychologist, Dr. Katzman); ECF No. 56-6 at 58 (letter from Doe's clinical professor, Dr. Downs); ECF No. 56-6 at 60–61 (letter from Doe's neuropsychologist, Dr. Bohn). These letters were included as part of Doe's appeal, submitted pursuant to the University's appeal process on October 31, 2020, ECF No. 56-6 at 63–64, but the University denied the appeal, concluding that "the SPC's decision was neither arbitrary nor capricious" as Doe was "granted multiple extensions of the 6 year time limit to complete graduation requirements, but ultimately failed to meet the final deadline set by the Committee," *id.* at 66. Doe again requested reconsideration by the University's School of Medicine leadership on July 12, 2022, *id.* at 73–74, but the University informed him that he had exhausted his formal appeal rights, *id.* at 75.

## II.    Procedural Background

Doe filed this action on August 31, 2022, alleging violations under Title II of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act.[6] *See* Compl. On November 23, 2022, Defendant moved to dismiss the Complaint for lack of jurisdiction, arguing Plaintiff had not exhausted his administrative remedies and that the ADA claim was barred by the Eleventh Amendment of the United States Constitution. *See* ECF No. 19. On April 10, 2023, the Court granted in part and denied in part Defendant's Motion, ECF No. 27, and Defendant answered the Complaint two weeks later, ECF No. 28.

On August 2, 2024, Defendant filed the instant Motion for Summary Judgment. *See* MSJ. On August 30, 2024, Plaintiff opposed, *see* Opp'n, and Defendant replied on September 13, 2024, *see* Reply.

---

[6] Doe also alleged violations of the Unruh Civil Rights Act and California Government Code § 11135, but he voluntarily dismissed those claims after Defendant filed a Motion to Dismiss. *See* ECF No. 22.

## ANALYSIS

### I.  Legal Standard

Under Federal Rule of Civil Procedure 56(a), a party may move for summary judgment as to a claim or defense or part of a claim or defense.  Summary judgment is appropriate where the Court is satisfied that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Material facts are those that may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine dispute of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  When the Court considers the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party.  *Celotex*, 477 U.S. at 323.  The moving party may meet this burden by identifying the "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'" that show an absence of dispute regarding a material fact.  *Id.*

Once the moving party satisfies this initial burden, the nonmoving party must identify specific facts showing that there is a genuine dispute for trial.  *Celotex*, 477 U.S. at 324.  This requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, to survive summary judgment, the nonmoving party must "by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts'" that would allow a reasonable fact finder to return a verdict for the non-moving party.  *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 248.  The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings."  *Anderson*, 477 U.S. at 256.

/ / /

## II.    Discussion

Doe asserts two claims against the University: (1) that the University violated Title II of the ADA and (2) that the University violated Section 504 of the Rehabilitation Act.  The University seeks summary judgment as to both claims.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  "Title II prohibits discrimination by state and local agencies, which includes publicly funded institutions of higher education." *Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1045 (9th Cir. 1999) (citing 42 U.S.C. § 12131(1)(B)).

Similarly, Section 504 of the Rehabilitation Act, after which Title II of the ADA was expressly modeled, *id.*, provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . .," 29 U.S.C. § 794.

Courts analyze claims brought under these two statutes under the same legal framework because "[t]here is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act." *Zukle*, 166 F.3d at 1045 n.11. Thus, to make out a prima facie case under either statute, a plaintiff

> must show that (1) she is disabled under the Act; (2) she is "otherwise qualified" to remain a student at the Medical School, i.e., she can meet the essential eligibility requirements of the school, with or without reasonable accommodation; (3) she was dismissed solely because of her disability; and (4) the Medical School receives federal financial assistance (for the Rehabilitation Act claim), or is a public entity (for the ADA claim).

14

*Id.* (first citing *Dempsey v. Ladd*, 840 F.2d 638, 640 (9th Cir. 1988); and then citing *Willis v. Pac. Mar. Ass'n*, 162 F.3d 561, 565 (9th Cir. 1998)).  For purposes of resolving the instant Motion, Defendant concedes the first and fourth elements of Plaintiff's prima facie case are satisfied.  *See generally* Mot.  That leaves the second and third elements in dispute.

Before addressing these elements, however, the Court is confronted with the threshold question of deference.  Because of "the limited ability of courts, 'as contrasted to that of experienced educational administrators and professionals,' to determine whether a student 'would meet reasonable standards for academic and professional achievement established by a university,'" the Ninth Circuit has held "that an educational institution's academic decisions are entitled to deference." *Zukle*, 166 F.3d at 1047 (quoting *Doe v. N.Y. Univ.*, 666 F.2d 761, 775–76 (2d Cir. 1981)).  The degree to which the Court should defer to the University in the present case is where the Court must begin its analysis.

### A.    *Deference*

The Ninth Circuit sculpted the contours of judicial deference to academic institutions in the context of ADA claims in a pair of cases in 1999.  *See Zukle*, 166 F.3d at 1047–48; *Wong v. Regents of Univ. of Cal.*, 192 F.3d 807, 817 (9th Cir. 1999).  In extending deference, the court joined a chorus of other circuits to have examined the issue, and at this point, the rule is nearly universal.  *See Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 463 (4th Cir. 2012) (recognizing the extension of deference "to schools' professional judgments regarding students' qualifications when addressing disability discrimination claims" in the Second, Eighth, Ninth, Sixth, Fifth, First, Seventh, and Third circuits).  To better understand when and how to extend deference, the Court finds it useful to explore those two cases.

In *Zukle*, the court affirmed the district court's grant of summary judgment in favor of the Regents of University of California on ADA and Rehabilitation Act claims.  166 F.3d at 1051.  In reaching that conclusion, the court first considered the threshold question of whether it should accord deference to the Regents when they decided to dismiss a medical student at the University of California, Davis.  *Id.* at 1044.  Although there was no Supreme

Court precedent directly on point, the court extended the rule from *Regents of the University of Michigan v. Ewing*, in which the Court held that, in reviewing a due process violation claim, lower courts "may not override [a genuinely academic decision] unless it is such a substantial departure from accepted norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Zukle*, 166 F.3d at 1047 (quoting *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985)). Recognizing that "courts are particularly ill-equipped to evaluate academic performance," the Ninth Circuit held that courts should accord deference to an educational institution's determinations both as to whether a reasonable accommodation is available and as to whether an individual would be otherwise qualified if given that accommodation. *Id.* at 1047–48 (quoting *Doe*, 666 F.2d at 775–76).

The court then proceeded to analyze whether three separate proposed accommodations were reasonable, and it concluded that the medical school was not required to accommodate the plaintiff after deferring to the Regents on each accommodation. The court considered several factors, including whether or not the medical school had offered the specific proposed accommodation to other students, *id.* at 1049, whether the medical school could articulate why a proposed accommodation might sacrifice the integrity of the program, *id.* at 1050, and whether the medical school reached a "rationally justifiable conclusion" in denying the proposed accommodation, *id.* at 1050–51 (quoting *Wynne v. Tufts Univ. Sch. of Med.*, 932 F.2d 19, 26 (1st Cir. 1991) (*Wynne I*)). Although deference was extended there, the court cautioned that the judiciary "must be careful not to allow academic decisions to disguise truly discriminatory requirements" by ensuring the educational institution "submit[s] a factual record indicating that it conscientiously carried out this statutory obligation." *Id.* at 1048. If that mark is met, however, courts "will defer to [an academic institution's] academic decision." *Id.*

Later that same year, the Ninth Circuit clarified in *Wong* what an educational institution must do to carry out its "statutory obligation" in reaching a genuinely academic decision. There, the court declined to defer to an academic institution that had denied an

accommodation to another medical student at University of California, Davis. *Wong*, 192 F.3d at 819–20, 823. In referencing the "statutory obligation" referred to in *Zukle*, the court explained that

> [s]ubsumed within this standard is the institution's duty to make itself aware of the nature of the student's disability; to explore alternatives for accommodating the student; and to exercise professional judgment in deciding whether the modifications under consideration would give the student the opportunity to complete the program without fundamentally or substantially modifying the school's standards.

*Id.* at 818. Only after fulfilling this obligation should the court "defer to the institution's academic decisions . . . ." *Id.*

In applying this standard to the medical school in *Wong*, the court declined to extend deference because the Dean who rejected the proposed accommodation did so "without informing himself of Wong's need for accommodation of his learning disability" or "discuss[ing] Wong's proposal with any of the professionals who had worked with Wong to pinpoint his disability and help him develop skills to cope with it." *Id.* at 819. Further, the Dean failed to consider "the School of Medicine's curriculum or standards" when rejecting the proposal. *Id.* Instead, the Dean merely provided a post-hoc rationalization via declaration two months after his deposition for the case where he gave reasons unrelated to the curriculum's purposes. *Id.* Additionally, the Promotions Board had failed "to take Wong's disability and need for accommodation into account" when it recommended dismissal from the medical school under the false premise that Wong had previously failed a clerkship *with* the requested accommodation when, in fact, he had been denied an accommodation for that clerkship and had performed well in different clerkships after receiving the same accommodation. *Id.*

After eschewing deference, the court easily found issues of fact from which the jury could find that the requested accommodation was reasonable, and that the plaintiff was

qualified such that he could meet the school's academic standards. *Id.* at 821, 825. The court described deference as a "double-edged sword" that allows academic institutions "a significant amount of leeway in making decisions about their curricular requirements and their ability to structure their programs," but also demands a careful consideration of "each disabled student's particular limitations" so that the school does not make "those decisions for arbitrary reasons unrelated to its academic standards." *Id.* at 826. If the institution gets over that hurdle, however, courts "abstain from an in-depth, *de novo* analysis of suggested accommodations that the school rejected." *Id.* at 818.

Neither Party disputes that the Ninth Circuit extends deference to academic decision-making in the abstract, but they disagree about whether it should be extended to the particulars of this case. Defendant argues that "if the school submits a factual record detailing its professional judgment in making the decision [to deny the accommodation]," then the Court must defer to the University. Mem. at 20.[7] And in this case, the University claims that it "maintained a meticulous, 46-page factual record detailing its meetings and decision-making as to every single one of Plaintiff's accommodation requests to the SPC," considering factors such as "Plaintiff's disability, his academic performance throughout his tenure (including on the Step 2 CK), and his consistent failure to meet deadlines even when he received accommodations for those deadlines." *Id.* at 21. According to Defendant, the factual record submitted by the University "more than satisfies the *Zukle* and *Wong* requirements," and "Plaintiff's claims fail as a result." *Id.* at 22.

Doe makes just one passing reference in his Opposition to the deference doctrine, stating that the University's decision to deny the requested accommodation "should not be entitled to deference because Defendant has failed to present a record undisputedly showing that the proposed accommodation substantially alters the school's curriculum, program, or high academic standards." Opp'n at 23. But aside from that single direct

---

[7] Pin citations refer to the CM/ECF page numbers electronically stamped at the top of each page of the cited filing.

challenge to the University's contention that it is entitled to deference, Doe does advance several other indirect arguments that the University failed to satisfy the standard set out in *Wong*. *First*, Doe argues that the SPC failed to speak to OSD or "to Plaintiff's physicians who made recommendations regarding accommodations." *Id.* at 24. *Second*, Doe argues that the SPC failed to consider whether the "requested accommodation would 'fundamentally or substantially' alter the school's standards." *Id.* *Third*, Doe argues that the University violated the Handbook when it dismissed him without determining "whether other accommodations can be identified that would have such effect but that would facilitate the student's medical education." *Id.* at 25. *Fourth*, Doe argues that the University merely provided an "after the fact rationale" as to why a final extension to his graduation deadline would constitute a fundamental change to the University's academic standards.[8] *Id.*

Although Doe incorrectly articulates the standard set forth in *Wong*,[9] the arguments he raises do implicate some of the considerations the Court must take into account when determining whether the University satisfied its "obligation to present 'undisputed facts' showing that it conscientiously considered whether possible modification would fundamentally or substantially alter the school's standards." *Wong*, 192 F.3d at 819. That

---

[8] Doe also argues that he has created a genuine dispute of material fact as to whether his requested accommodation was reasonable because NBME policies allow M.D. candidates up to four attempts to pass the Step II Exam and up to ten years to complete all Step Exams. Mem. at 26. But there can be no dispute that medical institutions are free to impose stricter academic standards than those of other institutions or licensing organizations. *See Wynne v. Tufts Univ. Sch. Of Med.*, 976 F.2d 791, 795 (1st Cir. 1992) (according deference to medical school even though the plaintiff had "offered evidence that at least one other medical school and a national testing service occasionally allow" the requested accommodation); *McGregor v. La. State Univ. Bd. of Supervisors*, 3 F.3d 850, 859 (5th Cir. 1993) ("[W]hether the [American Bar Association ("ABA")] accredits part-time programs is not determinative of reasonableness under the Rehabilitation Act, and we refrain from giving ABA accreditation such adjudicatory effect.").

[9] Indeed, the deference analysis cares not at all about the record as it relates to the reasonableness of the requested accommodation, but rather focuses exclusively on the academic institution's internal decision-making process for deciding whether to grant or deny the accommodation. *See Wong*, 192 F.3d at 817–18.

the University must present "undisputed facts" matters because any dispute as to whether the academic institution reached a "rationally considered decision" precludes application of deference and results in de novo review by the Court. *See Wong*, 192 F.3d at 821–23. To determine if the University has presented "undisputed facts" that it reached a "professional, academic judgment," the Court will consider each of Plaintiff's arguments on their own terms.

As to Doe's first argument, the Court is not persuaded that Doe has created a genuine dispute of material fact simply because the SPC failed to directly engage with OSD or Doe's treating physicians before denying the requested accommodation on August 26, 2020. The pertinent obligation under *Wong* is for the University "to make itself aware of the nature of the student's disability;" nothing more. *Wong*, 192 F.3d at 807. Here, it is clear the SPC met that criterion in considering Doe's series of petitions. True, the SPC's final meeting does not indicate a renewed evaluation of Doe's health status, but by the time the SPC met on August 26, 2020, it had already established "a firm deadline" in its meeting on April 23, 2019, in which it granted a one-year extension for Doe to complete his graduation requirements. ECF No. 52-5 at 41–42. When viewed in light of the April 23, 2019 meeting, the University undisputedly made itself aware of Doe's disability.

On April 23, 2019, the SPC recorded twelve pages of facts, findings, decisions, and disposition related to Doe's request to extend his graduation limit from seven years to eight years. In that meeting, "[t]he Committee reviewed letters [Doe] had shared with the Committee, including one from his psychiatrist, Dr. Nancy Downs, and another from his therapist, Dr. Mara Katzman. Drs. Downs and Katzman both recommended that [Doe] be granted additional time for completion of the M.D." *Id.* at 32. The Committee also "noted that in March of 2018 [OSD] had recommended that [Doe] be granted extended time, 1.5 the standard amount of time to complete to complete [sic] written exams/ clerkship written exams, and also recommended extended time to complete program requirements in the [School of Medicine]." *Id.* Additionally, Doe mentioned in the meeting that his neuropsychologist, Dr. Bohn, had recommended "a referral to the Scripps Encinitas

Hospital Outpatient Brain Clinic for Speech Therapy to aid him in working on his poor auditory free recall." *Id.* at 37. OSD representatives and Doe's physicians may not have been present at the April 23, 2019 meeting, and the SPC may not have accepted their recommendations, but their input as to the nature of Doe's disability was surely made known to and considered by the SPC.

Indeed, the SPC had made itself aware of Doe's disability since at least 2016. Over the course of Doe's tenure at the University, the SPC met no less than eleven times, *see id.* at 5, 6, 9, 12, 14, 17, 27, 29, 31, 43, 47, and it had considered reports from Doe's treating physicians dating back to its August 31, 2016 meeting. In that meeting, Doe "granted permission to share the results of his neuropsychological assessment with two committee members, Dr. Lisa Eyler and Dr. Sandra Brown, with the understanding that they may present a summary of the results to the SPC." *Id.* at 7. Drs. Eyler and Brown summarized Doe's neuropsychological testing and reported the results to the committee. *Id.* Dr. Eyler, who served as Chair of the SPC from September 2013 through October 2020, provided a declaration consistent with the committee notes affirming that, in granting Doe the first of his one-year graduation extensions, "the SPC considered that Plaintiff had been injured in a car crash the year prior that was fatal to two other medical students, and that Plaintiff had submitted documentation which indicated ongoing mental health challenges and testing results indicating poor verbal memory performance and low reading speed." Declaration of Lisa Eyler ("Eyler Decl.," ECF No. 52-10) ¶ 7. Dr. Eyler, who was present at every SPC meeting regarding Doe, *see* ECF No. 52-5 at 5, 6, 9, 12, 14, 17, 27, 29, 31, 43, 47; Eyler Decl. ¶ 4, represented that "[t]hroughout the years of considering petitions from Plaintiff and monitoring Plaintiff's academic progress, the SPC consistently considered the extreme adversity that Plaintiff faced due to the car accident he survived and the physical and emotional consequences of that event." Eyler Decl. ¶ 12. Doe has provided no reason to doubt this factual record.

As to Doe's second and fourth arguments, the Court is not persuaded that Doe has created a genuine dispute of material fact because the SPC, in denying Doe's requested

accommodation, failed to expressly conclude that the requested accommodation would affect a "fundamental or substantial alteration" of the University's academic standards. There are no magic words that an academic institution must recite in the course of denying an accommodation request, *see Zukle*, 166 F.3d at 1050 (crediting a statement by the Dean of a medical school that the requested accommodation "would compromise the clerkship's curricular purpose"), and post-dismissal rationales are permissible in justifying what does or does not constitute a fundamental alteration of the nature of the curriculum, *see id.* (crediting an affidavit by the Dean of a medical school "in which he explained the significance of the clinical portion of the Medical School curriculum"); *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794–95 (1st Cir. 1992) ("*Wynne II*") (after remand vacating grant of summary judgment in favor of medical school, crediting six new affidavits presented by the school that "demythologized the institutional thought processes leading to its determination that it could not deviate from its wonted format to accommodate [the student's] professed disability").

Here, the University has presented undisputed facts that it possessed a rational underpinning to its decision that an extension of the six-year graduation limit would constitute a "fundamental or substantial alteration" of academic standards. Dean Jess Mandel provided a Declaration, dated July 2, 2024, in which he outlined the three primary purposes of the six-year graduation limit. He explained that the six-year limit:

> [1] ensures the educational program functions as a coherent whole, and prevents students from losing knowledge over time through lack of use . . . [; 2] avoids a situation in which a student cannot finish their graduation requirements, and incurs debt and tuition ultimately toward an unsuccessful end . . .[; and 3] ensures students are able to meet UCSD's essential eligibility requirement of successfully meeting deadlines.

Mandel Decl. ¶ 3. These three primary purposes were consistent with those provided by Dean Mandel when he was deposed five months earlier on February 20, 2024. *See*

Deposition of Jess Mandel ("Mandel Dep.," ECF No. 52-4) at 84–85. So too are these purposes consistent with the Handbook, which provides that "[u]nder normal circumstances, students are expected to complete the requirements for the M.D. within 4 years" and that "[t]he medical school curriculum is designed to be pursued as a continuum." ECF No. 52-4 at 24.

Under applicable law, these justifications alone would be sufficient to conclude that the University undisputedly had a well-informed basis for its assertion that a graduation extension would be a "fundamental modification" of its program or standards. *Horodner v. Midwestern Univ.*, No. CV-20-01800-PHX-JAT, 2022 WL 4367601, at *3–4 (D. Ariz. Sept. 21, 2022). But Dr. Eyler also asserted that the SPC, as a factual matter, "takes into consideration that the ability to meet deadlines in a timely fashion is an essential requirement of graduation from UCSD's medical program." Eyler Decl. ¶ 11. The University, as expressed by Dr. Eyler, has "a duty to uphold the standards of UCSD by enforcing policy regarding timely completion of requirements and to only permit students to graduate with an MD degree who had demonstrated an ability to successfully fulfill UCSD's expectations."[10] *Id.* ¶ 12. Defendant has, thus, presented an undisputed record that its conclusion that a graduation deadline extension "would fundamentally alter the nature of the school's program" was well-informed. *Zukle*, 166 F.3d at 1048.

The problem with the record as presented by the University, however, relates to Plaintiff's third argument about the manner in which the SPC denied the disputed accommodation request. Unlike its previous decisions either granting or denying particular accommodation requests, the SPC's final decision denying the accommodation request at

---

[10] Plaintiff argued at oral argument that the University's Declarations should be discredited as inherently biased because the declarants are employees of the University and, as such, are financially compensated by the University; thus, they have a personal stake in the outcome. Put differently, Plaintiff advanced the rather bold suggestion that academic institutions should per se be prohibited from supporting the record as it relates to their decision-making with statements from their own officials. That argument, made without any legal support, directly contradicts the case law. *See, e.g.*, *Wynne II*, 976 F.2d at 794 (accepting the departmental chair's justification for denying an accommodation request to use non-multiple choice testing).

issue here was, at best, cursory. The notes of that decision, taken from the SPC's August 26, 2020 meeting, consist primarily of a recitation of Plaintiff's academic history, with only a few short paragraphs describing the actual analysis undertaken by the SPC. *See* ECF No. 52-5 at 47–50. Conspicuously missing from the final decision is any exploration of alternatives to Plaintiff's requested accommodation or any consideration of what effect on the University's standards one last graduation extension might have. Put simply, the record is disputed with respect to whether the University applied the proper considerations to the particulars of the disputed accommodation request.

That "[r]easonableness is not a constant" is an accepted premise in assessing disability accommodation requests. *Zukle*, 166 F.3d at 1048 (quoting *Wynne II*, 976 F.2d at 795). "To the contrary, what is reasonable in a particular situation may not be reasonable in a different situation—even if the situational differences are relatively slight." *Id.* (quoting *Wynne II*, 976 F.2d at 795). For this reason, even if the University had previously fulfilled its "duty to make itself aware of the nature of the student's disability; to explore alternatives for accommodating the student; and to exercise professional judgment in deciding whether the modifications under consideration would give the student the opportunity to complete the program without fundamentally or substantially modifying the school's standards," its duty to repeat that undertaking was revived upon Plaintiff's renewed accommodation request. *Wong*, 192 F.3d at 818. Put differently, even if the University had satisfied its duty under *Wong* in the SPC's April 2019 meeting granting Plaintiff's request to extend his graduation deadline from seven years to eight years, Plaintiff's 2020 request to extend his graduation deadline yet again presented a unique set of circumstances requiring a thorough review from the University. The Court should only "abstain from an in-depth, *de novo* analysis of suggested accommodations that the school rejected if the institution demonstrates that it conducted such an inquiry itself and concluded that the accommodations were not feasible or would not be effective." *Id.* With respect to the specific accommodation request at issue in this case, the Court is not convinced that the University performed the requisite in-depth, de novo analysis.

Bolstering the Court's conclusion is the haste with which the University dismissed Doe without a Review Hearing. The Handbook outlines several tools that the SPC has at its disposal when acting on concerns about its students. *See* ECF No. 52-4 at 66–72. One such tool is to hold a Review Hearing for students subject to dismissal. *See id.* at 68–70. The Handbook prescribes certain requirements that the SPC must abide by during a Review Hearing, including the requirement that "an affirmative vote by a minimum of two-thirds of the SPC members present—but in no event less than seven (7) affirmative votes—shall be required for dismissal of a student . . . ." *Id.* at 66. Additionally, in a Review Hearing, "[t]he student will be given the opportunity to present information on the student's behalf" and "have the opportunity to present any relevant information or subjective report of the considered performance or incident." *Id.* at 69. It is undisputed that Doe was not given a Review Hearing after the August 26, 2020 meeting in which the SPC denied his accommodation request nor was Doe present at that final meeting. *See* ECF No. 52-5 at 47–50.

The University resists the view that there is any relevance to this absent Review Hearing, arguing that Doe mischaracterizes the events that transpired after the SPC denied the final accommodation request. The University, in contrast to Doe's characterization that he was outright dismissed, contends that Doe was merely denied further registration. Reply at 6. Though the University agrees that the "Handbook requires the SPC to conduct a review hearing when deciding whether to dismiss a student, it does not require the SPC to conduct a hearing when students are denied further registration for failing to meet graduation requirements." *Id.* (citing ECF No. 52-4 at 66). While perhaps true in the most technical sense, the practical outcome is the same regardless of how the University slices or dices its decision.[11] Doe was effectively barred from pursuing completion of his medical

---

[11] At oral argument, the University suggested that, because Doe was merely denied further registration, he is free to seek enrollment at other medical schools to satisfy the NBME's Step Exam eligibility requirement. Doe responded that he has made numerous attempts at contacting other medical schools, but not a single one would entertain the notion of accepting Doe as a student. Regardless of the accuracy of

degree when Dr. Eyler emailed him on August 27, 2020, to inform him that his "deadline to complete MD requirements remains September 1, 2020." ECF No. 56-6 at 52. Call it what you will, but whether the University dismissed Doe or simply denied him further registration, this at least calls into question whether the University properly satisfied its own internal policies regarding disciplinary actions that result in the termination of enrollment.

It then logically follows that the record is disputed as it relates to whether or not the University "exercise[d] professional judgment in deciding whether the modifications under consideration would give the student the opportunity to complete the program without fundamentally or substantially modifying the school's standards."[12] *Wong*, 192 F.3d at 818. By making this final decision without Doe present, it also undermines the conclusion that the University "explore[d] alternatives for accommodating the student." *Id.* Even if, as the University argues, Doe was provided a de facto Review Hearing during the SPC's April 2019 meeting, the SPC did not analyze the pertinent accommodation request at issue during that meeting. Given the accepted premise that "[r]easonableness is determined on a case-by-case basis," the University cannot rest on its laurels by adopting its 2019 analysis during its 2020 meeting, which is largely what the SPC did. *Horodner*, 2022 WL 4367601, at *3. By not engaging in a renewed, de novo analysis of Doe's requested accommodation in 2020, the University failed to demonstrate that it is entitled to deference in this case.

---

these representations, doubt remains as to whether or not the University conscientiously fulfilled its obligations under *Wong*.

[12] The Court acknowledges that Dr. Eyler, Chair of the SPC, noted in her Declaration that in denying the disputed accommodation on August 26, 2020, the SPC considered multiple factors including, among others, the "extensive accommodation" already granted to Plaintiff, Plaintiff's "demonstrated pattern of requesting extensions to his deadlines once the deadlines approached," "Plaintiff's ability to succeed in a residency program and in the practice of medicine," and "Plaintiff's learning disability and his situation related to the May 2015 car crash." Eyler Decl. ¶ 10. But when contrasted with the dearth of evidence in the SPC's notes from its final meeting that the Committee indeed considered these factors, *see* ECF No. 52-5 at 47–50, there is at least a dispute as to the completeness of the review undertaken by the University in denying the disputed accommodation request.

Thus, the Court finds that the University has not met its "weighty responsibility of carefully considering each disabled student's particular limitations and analyzing whether and how it might accommodate that student in a way that would allow the student to complete the school's program without lowering academic standards . . . ." *Wong*, 192 F.3d at 826. Despite many years of continued support for Plaintiff following the tragedy that he suffered—support that the Court does not question in the slightest—because the University did not thoroughly consider its 2020 decision to deny the one final graduation deadline extension request at issue here, the Court finds that "a reasonable jury could conclude that the school made those decisions for arbitrary reasons unrelated to its academic standards." *Id.* Accordingly, the Court will not defer to the University in this instance and must engage in a "*de novo* analysis of suggested accommodations that the school rejected." *Id.* at 818.

### B.    Otherwise Qualified Prong

Plaintiff "bears the 'initial burden of producing evidence' both that a reasonable accommodation exists and that this accommodation 'would enable [him] to meet the educational institution's essential eligibility requirements.'" *Wong*, 192 F.3d at 816 (quoting *Zukle*, 166 F.3d at 1047). However, "[t]he Supreme Court has made clear that an educational institution is not required to make fundamental or substantial modifications to its program or standards; it need only make reasonable ones." *Zukle*, 166 F.3d at 1046 (citing *Alexander v. Choate*, 469 U.S. 287, 300 (1985)). Thus, once the plaintiff satisfies his burden of production, the burden shifts back "to the University to produce rebuttal evidence that either (1) the suggested accommodation is not reasonable (because it would substantially alter the academic program), or (2) that the student is not qualified (because even with the accommodation, the student could not meet the institution's academic standards)." *Wong*, 192 F.3d at 817 (citing *Zukle*, 166 F.3d at 1047).

The implementing regulations of the Rehabilitation Act exemplify this burden-shifting framework. Under 34 C.F.R. § 104.44, which addresses modifications to academic requirements in the education context,

[a] recipient to which this subpart applies shall make such modifications to its academic requirements as are necessary to ensure that such requirements do not discriminate or have the effect of discriminating, on the basis of handicap, against a qualified handicapped applicant or student. Academic requirements that the recipient can demonstrate are essential to the instruction being pursued by such student or to any directly related licensing requirement will not be regarded as discriminatory within the meaning of this section. Modifications may include changes in the length of time permitted for the completion of degree requirements . . . ."

Given this framework, the Court proceeds to determine whether Doe has created a triable issue of material fact with respect to (1) whether the requested accommodation was reasonable and (2) whether he would have been a qualified individual if he had been given the requested accommodation.

### 1. Reasonable Accommodation

Given the absence of deference to the University in the present case, the Court comfortably concludes that there is a triable issue of material fact as to whether the requested accommodation was reasonable. Supporting this conclusion are the similarities between the evidence produced here and the evidence produced in *Wong*, where the Ninth Circuit denied the medical school summary judgment after declining to extend deference.

In *Wong*, the court found an issue of fact with respect to the reasonableness of the requested accommodation for three primary reasons. *First*, there was evidence of medical school faculty recommending the requested accommodation in light of the student's success in a prior clerkship after having received the same accommodation. *Wong*, 192 F.3d at 820. *Second*, there was evidence that the medical school had granted the same accommodation to the student in two previous clerkships. *Id. Third*, in those two prior instances, the student had performed satisfactorily and "received generally positive

comments" after having received the same accommodation as the one eventually rejected. *Id.* at 821.  Similar circumstances are present here.

*First*, Doe has several individuals who have vouched for his continued ability to meet the academic standards of the University if granted the requested accommodation. As just one example, Doe's faculty advisor, Dr. Ellen Beck, joined the April 23, 2019 SPC meeting in which Doe was granted his second one-year extension.  ECF No. 31 at 33.  In that meeting, Dr. Beck shared that "given what Doe has done and shown, his dedication, his clinical competence, the enjoyment she has seen him have seeing patients, and the patients valuing him as a clinician or a future physician, she felt that he deserved being given" the second one-year extension.  *Id.* at 39 (cleaned up).  As someone who a "jury could have found . . . a persuasive authority on the issue," Dr. Beck's input would be potentially probative evidence that decelerating Doe's graduation was a reasonable request. *See Wong*, 192 F.3d at 820.

*Second*, the University had previously granted extensions to Doe's graduation requirement on three other occasions.  On August 31, 2016, the SPC extended Doe's deadline from June 2018 through June 2019.  ECF No. 52-5 at 8.  On April 23, 2019, the SPC extended Doe's deadline from June 2019 through June 2020.  *Id.* at 41.  And on April 29, 2020, the SPC extended Doe's deadline through September 1, 2020.  *Id.* at 46. Though an "institution's past decision to make a concession to a disabled individual does not obligate it to continue to grant that accommodation in the future," *Wong*, 192 F.3d at 820 (citing *Myers v. Hose*, 50 F.3d 278, 284 (4th Cir. 1995)), that past decision "is certainly persuasive evidence from which a jury could conclude that the accommodation was reasonable," *id.* (citing *Hunt-Golliday v. Metro. Water Reclamation Dist.*, 104 F.3d 1004, 1013 (7th Cir. 1997)).

*Third*, Doe had successfully retaken and passed the Step Exams—which he had previously failed—after having been given his first two one-year extensions.  After being given his first one-year extension on August 31, 2016, Doe retook the Step I Exam that he had failed twice, and he passed the exam on his third attempt.  ECF No. 52-5 at 12.  Doe's

only remaining graduation requirement at the time his final extension request was denied was successful completion of the Step II CK Exam, but where an accommodation had been successful in the past, it may "indicate[] that it may have been reasonable for [the student] to continue receiving this same accommodation." *Wong*, 192 F.3d at 821 (citing *Roberts v. Progressive Indep., Inc.*, 183 F.3d 1215, 1220 (10th Cir. 1999)).

## 2.     Qualified Individual

It is undisputed that Doe was not qualified to meet the University's essential eligibility requirements without the requested accommodation. Per the Handbook, students must take and pass the Step II CK Exam within six years of matriculation. ECF No. 52-4 at 12. Due to Doe's multiple failures of the Step II CK Exam, he had clearly not met that requirement, even within the eight years given to Doe after his first two one-year extensions. The question is, instead, whether Doe was "able to meet the educational institution's essential eligibility requirements *with or without* the aid of reasonable accommodations." *Zukle*, 166 F.3d at 1046 (citing *Barnett v. U.S. Air, Inc.*, 157 F.3d 744, 749 (9th Cir. 1998), *vacated*, 535 U.S. 391 (2002)).

As above, given the absence of deference to the University, the Court concludes that there is a triable issue of material fact with respect to whether Doe would have been otherwise qualified with the aid of an additional graduation extension. With the exception of his two-time failure of the Step II CK Exam, Doe otherwise satisfactorily fulfilled his other graduation requirements. And consistent with his claim that he received favorable evaluations from his fourth-year clerkship professors, Doe received either a grade of Pass or Honors in all fourth-year clerkships, with several professors noting "Near Honors" performance. *See* ECF No. 56-6 at 2–3. Doe's professors' evaluations ranged from comments that Doe "consistently came to cases prepared and demonstrated advanced knowledge of the subject material relative to his level of training" to reflections that Doe "will do well in residency with his thorough and thoughtful approach to patients." *Id.*

Further, despite the fact that Doe had not yet passed the Step II CK Exam, he has produced evidence suggesting he was well situated to pass the exam on his third attempt.

Doe had persevered through several failures of the Step I Exam before eventually passing, ECF No. 52-5 at 31–32, and he had a similar result after multiple attempts of the CPX exam, *id.*  Multiple SPC members recognized Doe's strong clerkship performance during his April 23, 2019 meeting, commenting that his health issues "are not impairing his ability to function on [clinical] rotations, as it looked like he did quite well" and that he "seems to excel clinically, so there is reason to feel that there will be an improvement."  *Id.* at 38. Simply put, the evidence is rather persuasive that Doe demonstrated strong academic performance.

The University, however, argues that its decision to deny the requested accommodation was not related to Doe's academic performance so much as his inability "to successfully meet deadlines."  Reply at 8.  In support of this contention, the University points to the April 23, 2019 SPC meeting where Doe was granted his second one-year extension.  Mem. at 17.  Specifically, the University explains that this second extension was premised upon giving Doe enough "time to re-apply for testing accommodations with the NBME, receive the results of this application, and take Step 2 CK twice if needed."  *Id.* Yet despite the shared understanding that this would be his final extension and the recommendation that he apply for accommodations immediately, Doe "waited *eight months* to apply for accommodations" and he later failed the exam after the accommodations request was denied.  *Id.* (emphasis in original).

Compelling as the University's argument may be that Doe's conduct was violative of the professionalism standards expected at the medical school, said conduct does not render Doe unqualified as a matter of law.  Perhaps the Court may be inclined to reach an alternative conclusion if it had extended deference to the University's decision-making on this point, but under a de novo review, Doe has produced sufficient evidence to create a triable issue on the matter.  After the denial of the requested accommodation, Doe submitted letters from at least three individuals advocating on his behalf, including one taking the position that Doe "has taken a pro-active stance to his education" and that, despite the setbacks he faced with his health, Doe "was determined to enhance his

understanding of behavioral health issues" by "work[ing] hard at studying for the exams, planning a set schedule or routine for study" and seeking "the help of a psychiatrist to help him establish a better mood cycle." *See* ECF No. 56-6 at 55 (letter from Doe's psychologist, Dr. Katzman); ECF No. 56-6 at 58 (letter from Doe's clinical professor, Dr. Downs); ECF No. 56-6 at 60–61 (letter from Doe's neuropsychologist, Dr. Bohn). These opinions would constitute a sufficient basis from which a jury could find that Doe's professional attributes would make him qualified to meet the University's standards.[13]

Having reviewed the record de novo, the Court cannot conclude that Doe was unqualified to continue at the University as a matter of law. To be sure, Doe's performance in certain areas of his medical school journey may have been "less than ideal," but that would not preclude a jury from determining that he was qualified to continue participating in the medical program. *Wong*, 192 F.3d at 824. Accordingly, the Court does not grant summary judgment to the University on this basis.

### C.    Causation Prong

Both the ADA and the Rehabilitation Act prohibit discrimination on the basis of disability. *Weinreich v. L.A. Cnty. Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997). Specifically, Title II of the ADA provides that "[n]o qualified individual with a disability shall, *by reason of such disability*, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (emphasis added). Similarly, Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, *solely by reason of her or his disability*, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any

---

[13] At oral argument, the University for the first time took issue with the admissibility of these documents. This argument, however, was omitted from the University's written briefs, so the Court refrains from addressing this undeveloped contention. *See Acasio v. Lucy*, No. 14-cv-04689-JSC, 2017 WL 1316537, at *10 (N.D. Cal. Apr. 10, 2017) ("It is even more unfair and prejudicial to raise new arguments and authorities for the first time at oral argument, taking the opposing party by surprise and affording no opportunity to respond whatsoever.").

program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794 (emphasis added).

Though expressed in slightly different language, the Ninth Circuit has held that both provisions establish the same causation requirement. Said requirement dictates that a "plaintiff proceeding under Title II of the ADA must, similar to a Section 504 plaintiff, prove that the exclusion from participation in the program was 'solely by reason of disability.'" *Weinrich*, 114 F.3d at 978–79 (quoting *Does 1–5 v. Chandler*, 83 F.3d 1150, 1155 (9th Cir. 1996)).

To meet that requirement, "the plaintiff must show that the action would not have been taken 'but for' the disability." *Uhuru v. Bonnifield*, No. 2:19-cv-10449-JVS-KES, 2021 WL 3870479, at *9 (C.D. Cal. 2021) (citing *Murray v. Mayo Clinic*, 934 F.3d 1101, 1107 (9th Cir. 2019), *cert denied*, --- U.S. ---, 140 S. Ct. 2720 (2020)).[14] As applied to this case, the "but for" inquiry translates into a burden on Doe to establish that, but for his learning disability, he would not have been denied further enrollment at the University.

The University argues that it did not deny Doe further registration because of his disability but, instead, "because he was unable to complete his graduation requirements as

---

[14] The *Uhuru* court noted that *Murray* held only that "ADA discrimination claims under *Title I* must be evaluated under a but-for causation standard." 2021 WL 3870479, at *9 (emphasis added). Nonetheless, the court applied the same standard to a claim under *Title II* of the ADA based on the Supreme Court's decision in *University of Texas Southwest Medical Center v. Nassar*, 570 U.S. 338 (2013), which "explain[ed] that 'because of,' 'by reason of,' 'on account of,' and 'based on' all indicate a but-for causal relationship." *Uhuru*, 2021 WL 3870479, at *9 n.6.

The University contends that the Court should apply the but-for standard, which is undeniably more favorable to its position than the less strict "motivating factor" standard that the Ninth Circuit previously applied to Title II claims. *See K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1099 (9th Cir. 2013). For his part, Doe does not dispute the University's contention. *See* Opp'n at 26–27. Because Doe has not raised the issue and because the growing consensus in the lower courts is to apply the "but-for" standard to Title II claims, the Court accepts the University's contention. *See D.M. v. Or. Sch. Activities Assoc.*, 2024 WL 2132570, at *5 (first citing *Sabatini v. Nev. State Bd. of Nursing*, No. 2:22-cv-00219-GMN-VCF, 2023 WL 4963770, at *3 (D. Nev. Aug. 2, 2023); then citing *Murray*, 934 F.3d at 1106; and then citing *Bostock v. Clayton County, Georgia*, 590 U.S. 644, 656 (2020)).

In any event, the Court need not thoroughly analyze the issue because, even under this more demanding standard, the University's Motion is unsuccessful as to the causation element.

scheduled." Mem. at 18. The University claims that, far from intentionally discriminating against Doe because of his disability, it went out of its way to aid him in obtaining accommodations both through the school and through the NBME. *Id.* at 19. Beyond that, the University points out that Doe has not produced any evidence demonstrating an overt intention to discriminate and that the only evidence possibly suggesting discriminatory animus was Dean Mandel's recommendation at one point against requesting NBME accommodations because it might impact Doe's ability to meet the six-year graduation requirement. *Id.*

The fundamental oversight with the University's argument is that discrimination claims under Title II of the ADA are not limited to intentional discrimination. The Ninth Circuit held as much in *Crowder v. Kitagawa*, where it discerned Congress's clear intention for "the ADA to cover at least some so-called disparate impact cases of discrimination." 81 F.3d 1480, 1483 (9th Cir. 1996). In so doing, the court observed that, in *Alexander v. Choate*, "the [Supreme] Court concluded that Congress intended to protect disabled persons from discrimination arising out of both discriminatory animus and 'thoughtlessness,' 'indifference,' or 'benign neglect.'" *Id.* at 1484 (quoting *Choate*, 469 U.S. at 295). This reasoning, which extends Title II and Rehabilitation Act claims beyond intentional discrimination, is in accord with that of several other circuits. *See Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 847 (7th Cir. 1999) (canvassing cases from the Fifth, Sixth, Eighth, Ninth, and Tenth Circuits).

Doe's argument, in contrast to that of the University, comports with this more general protection afforded by the ADA and Rehabilitation Act. He argues that his inability to meet the graduation deadlines was directly "due to his acquired disability." Opp'n at 26. He points to his three disability-related leaves of absence—amounting to almost three years of leave—as substantial setbacks placing beyond reach timely graduation. *Id.* These setbacks, in turn, impacted his ability to sit for and pass the Step II CK Exam, his last remaining graduation requirement. *Id.*

Doe has the better of the arguments, and the Court is persuaded by the reasoning of

the Seventh Circuit in *Washington v. Indiana High School Athletic Association*, a closely analogous case.  There, a high school student was denied eligibility to participate on his high school basketball team due to a rule limiting students' eligibility to the first eight semesters following commencement of the ninth grade ("Rule").  *Washington*, 181 F.3d at 842.  The student's dilemma was that he suffered from a learning disability that had resulted in him dropping out of high school for a period of time after he had commenced ninth grade.  *Id.*  After encouragement from a coach over the summer, the student returned to a new high school where he continued playing basketball until his participation was blocked by the Rule.  *Id.*

There, consistent with the Ninth Circuit's view in *Crowder*, the Seventh Circuit held that Title II and Rehabilitation Act discrimination claims "may be established by evidence that (1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionately impacts disabled people."  *Id.* at 847 (adopting interpretation of the court in *McPherson v. Mich. High Sch. Athletic Ass'n*, 119 F.3d 453 (6th Cir. 1997)).  Under that framework, the court determined that the student simply had to "establish that the defendant's refusal to grant [the student] a waiver was a failure to make a reasonable accommodation."  *Id.* at 848.

The court went on to find the causation requirement satisfied.  The plaintiff's only burden was to "establish that, but for his learning disability, he would have been eligible to play sports in his junior year."  *Id.* at 849 (citing *Dennin v. Conn. Interscholastic Athletic Conf., Inc.*, 913 F. Supp. 663, 669 (D. Conn. 1996), *vacated as moot*, 94 F.3d 96 (2d Cir. 1996)).  "Simply stated, [the student] claims that his disability caused him to drop out of school; otherwise he would have been able to play high school basketball.  In the absence of his disability, the passage of time would not have made him ineligible."  *Id.*  In other words, the court found that "but for [the student's] learning disability, he would not have dropped out of school," an action that directly resulted in the school's adverse application of the Rule.  *Id.*

The same logic applies here.  Doe contends that his disability led to several leaves

of absence, each of which contributed to his inability to complete his graduation requirements on time. If not for the tragic car accident that he was involved in, Doe argues, he would have "successfully completed all of his remaining coursework—it simply took a longer amount of time because of his disability." Opp'n at 26. The Court finds that the record adequately supports this contention as Doe's medical challenges are well-documented and irrefutable. *See, e.g.*, ECF No. 56-5 at 152–59 (Dr. Bohn's December 2015 neuropsychological assessment).

The University declined to address Doe's argument in its Reply, *see* Reply, but to a certain extent it suggests that the decision to deny Doe further registration was otherwise justified on account of Doe's inexplicable delay in seeking NBME accommodations when he was granted his second one-year extension on April 29, 2020. Recall that said extension was premised upon the assumption that Doe would apply for NBME accommodations without delay and take the Step II CK Exam for the second time by the end of the year so as to allow him a third and final attempt by his new May 24, 2020 deadline. *See* ECF No. 52-5 at 41–42. Yet it is undisputed that Doe did not apply for NBME accommodations until December 17, 2019, *see* Doe Dep. at 159:5–10, and the SPC used this delay as further evidence of Doe having "demonstrated a pattern of requesting deadline extensions," ECF No. 52-5 at 49.

Like the University, the Court is hard-pressed to find a reasonable explanation in the record as to why Doe delayed requesting NBME accommodations after the April 29, 2020 meeting.[15] But when considered in light of the entire context of Doe's eight-year tenure at the University, the Court finds that this mishap does not overwhelm the causation analysis such that a reasonable jury could not find that Doe was denied further registration "solely by reason of" his disability. Like the student in *Washington*, Doe's learning disabilities were a "but for" cause of his inability to graduate on time, a failure that directly led to the

---

[15] When asked at his deposition why he waited eight months to request accommodations, Doe responded: "The same answer I previously gave; that I don't believe I have enough time to apply for accommodations, take a test, receive an outcome twice in a one-year time frame." Doe Dep. at 159:11–17.

University's denial of the requested accommodation. The SPC admitted as much by relying on Doe's demonstrated "pattern of requesting deadline extensions" in denying the disputed accommodation, *see* ECF No. 52-5 at 49, yet these prior deadline extension requests were undoubtedly inextricably intertwined with Doe's disabilities resulting from the 2015 car accident. Accordingly, despite the lack of evidence suggesting discriminatory intent on the part of the University, the University cannot overcome Doe's showing of a "but for" causal relationship between his disabilities and the denial of his requested accommodation because the SPC's decision to deny the accommodation relied upon a pattern of conduct related to Doe's disability. *See Crowder*, 81 F.3d at 1483.

## CONCLUSION

For the above reasons, the University is not entitled to summary judgment because it has not demonstrated the genuine absence of a material fact as to either of the disputed prongs under Title II of the Americans with Disabilities Act or Section 504 of the Rehabilitation Act. In light of the foregoing, the Court **DENIES** Defendant's Motion for Summary Judgment (ECF No. 52) as outlined above.

**IT IS SO ORDERED.**

Dated:  December 16, 2024

Hon. Janis L. Sammartino
United States District Judge

22-CV-1506 JLS (VET)